UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RAFAEL MELLA-RODRIGUEZ,

                         Plaintiff,                         **REPORT AND**
                                                           **RECOMMENDATION**
               -against-                              CV 08-2321 (SJF)(ARL)

DAVID ROCK,

                         Defendant.
-------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**


        The petitioner, Rafael Mella-Rodriguez, is seeking a writ of habeas corpus, pursuant to 28

U.S.C. § 2254, challenging his 2003 conviction in the New York Supreme Court, Suffolk

County.  Upon a jury verdict, the petitioner was found guilty of Kidnaping in the First Degree,

Kidnaping in the Second Degree, Robbery in the First Degree, Criminal Use of a Firearm in the

First Degree, two counts of Criminal Possession of a Weapon in the Third Degree, and Criminal

Impersonation in the First Degree.  He is currently incarcerated at Great Meadow Correctional

Facility in Comstock, New York.

        In his petition, the petitioner asserts the following claims:

1.      The petitioner was denied his constitutional right to a trial by jury by the trial
         judge's improper supplemental jury charge.

2.      The trial court erred when it failed to suppress the evidence recovered from the
         search of the trunk of the Dodge Intrepid.

3.      The petitioner was denied effective assistance of counsel when trial counsel failed
         to request the special circumstantial evidence charge and failed to object to the
         court's failure to give that charge.

4.      The petitioner was denied his right to fair trial by the prosecutor's improper
         comments during summation.

5.     The prosecution failed to prove the petitioner's guilt beyond a reasonable doubt.  (*See* Pet. Habeas Corpus[1].)  Respondent argues that the petition should be denied because the claims are partly procedurally bared and are without merit.  (*See* Resp't Mem.[2])  For the reasons set forth below, the court respectfully recommends that the petition be dismissed in its entirety.

## BACKGROUND

The following facts are summarized from the testimony in the record of the petitioner's trial.  On July 9, 2002 around midnight, Michael DiMartino ("DiMartino"), the owner of Peppino's Pizzera, closed his business for the night, called his wife, telling her that he would be working late, and then drove to the home of his lover, Margaret Castro ("Castro").  (Tr.[3] at 364, 366-38.)  From there he drove with her to a hotel, where they spent about an hour together.  (*Id.* at 369-70.)  Afterward, DiMartino dropped Castro off at her home and proceeded home himself. (*Id.* at 370.)

Somewhere between 2:00 to 2:30 a.m., following his usual route home, DiMartino saw a green van parked on the side of the road with its hazzard lights on.  (*Id.* at 378.)  As he approached, the van pulled into the middle on the road and "jackknifed" across it.  (*Id.*) DiMartino, thinking the van was having engine trouble, attempted to drive around the van.  (*Id.* at 378-79.)  As he did so, DiMartino noticed another car approaching from his rear view mirror. (*Id.* at 379.)  The second car, a champagne colored Dodge Intrepid, drove around DiMartino

---

[1]"Pet. Habeas Corpus" refers to Rodriguez's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody.

[2]"Resp't Mem." refers to the Respondent's Memorandum of Law.

[3]"Tr." refers to the transcript of Rodriguez's trial.

blocking him from going forward.  (*Id.*)  Then a third car approached, which stopped directly behind DiMartino's car, blocking his retreat.  (*Id.* at 379-80.)

Two men wearing N.Y.P.D. t-shirts, displaying badges that hung around their necks, and brandishing handguns emerged from the Dodge Intrepid.  (*Id.* at 380-81.)  They approached DiMartino, identified themselves as police officers, pulled him out of the car, and pointed a gun in his face.  (*Id.* at 382.)  DiMartino later identified one of the men to be Joel Rojas, a former employee who had been fired approximately a year and a half prior.  (*Id.* at 424-26.)  Then two or three other men approached DiMartino from behind.  (*Id.* at 384.)  He was beaten and a cloth, sack-like article was put over his head.  (*Id.* at 383-84.)  DiMartino was then picked up and forced into the back of the van, where a sock was shoved in his mouth and he was struck about the head, knees, and groin with a metal object.  (*Id.* at 384, 386, 389, 396.)

DiMartino's captors demanded his home phone number, which they used to call DiMartino's home.  (*Id.* at 388.)  Mrs. DiMartino answered the phone and her husband told her to bring all of their money to the front door because he was being held at gun point.  (*Id*. at 76-77.)  The time of the phone call was approximately 2:50 a.m.  (*Id*. at 76.)

After speaking with her husband, Mrs. DiMartino informed her father, who was spending the night, about what had just occurred.  (*Id.* at 78.)  Domenico Malvizzo ("Malvizzo"), Mrs. DiMartino's father, went to the front door and saw a black four-door sedan pull up to the driveway.  (*Id.* at 160.)  Malvizzo triggered the panic alarm and opened the door to a Hispanic male, dressed in black with a baseball cap.  (*Id.* at 161-62.)  Malvizzo confronted this person, who fled as soon as the alarm sounded.  (*Id.* at 164.)

Immediately thereafter, police officers began arriving at the DiMartino residence and

learned what had transpired.  (*Id.* at 38.)  Police radios broadcasted the news of DiMartino's disappearance.  (*Id.* at 37-38.)  Officer Liollio radioed that he had found an unattended Volkswagen with its lights on in a nearby parking lot.  (*Id.* at 193.)  Officer Conway, who was at the DiMartino residence, immediately responded to the parking lot.  (*Id.* at 194.)  Officers Liollio and Conway inspected the Volkswagen, determined that the engine was still warm, and that the car belonged to the DiMartinos.  (*Id.*)

Immediately after discovering DiMartino's abandoned vehicle, Officer Conway began patrolling the area looking for anything suspicious.  (*Id.* at 195.)  While he was driving down Monarch Avenue, a residential street in Selden not far from where DiMartino's Volkswagen was found, he observed a gold Dodge Intrepid pull out of nowhere, headlights off, and speed down the street.  (*Id.* at 196-97.)  The car was being driven in a manner to remain within the dark shadows between the street lights.  (*Id.* at 197.)  The time was approximately 3:15a.m.  (*Id.* at 195.)  Officer Conway sped up to catch up to the Dodge Intrepid, which was exceeding the speed limit.  (*Id.* at 197-98.)  When both vehicles reached a nearby stop sign, Officer Conway could observe both the driver and passenger repeatedly looking back and shuffling around inside the car.  (*Id.* at 199-200.)  This activity seemed suspicious to Officer Conway, and he called for back-up.  (*Id.* at 201-03.)  Officer Conway continued to follow the vehicle and noted that the vehicle made unnecessarily prolonged stops at several stop signs along the way.  (*Id.* at 203-04.)  This indicated to Officer Conway that the vehicle was being driven aimlessly.  (*Id.* at 204.)  As he followed the vehicle, Officer Conway determined that the vehicle was registered to a Brooklyn address.  (*Id.* at 203.)

As soon as backup arrived, Officer Conway stopped the Dodge Intrepid, which was being

driven by the petitioner, with Richard Garcia as a passenger.  (*Id.* at 196-211.)  Officer Conway

asked to see the petitioner's license and registration.  (*Id.* at 205.)  The petitioner was able to

produce a driver's license but no car registration.  (*Id.*)  Garcia, the passenger, had no

identification.  (*Id.* at 218.)  Officer Conway questioned the petitioner about where he had been

and where he was headed.  (*Id.* at 207.)  Officer Taormina directed the same questions to Garcia.

(*Id.* at 281.)  Petitioner stated that he had been at the Tanger Mall in Riverhead and was looking

for a gas station.  (*Id.* at 208.)  At one point the petitioner, who up to that point had been

speaking in English, spoke to Garcia in Spanish.  (*Id.*)  Concerned that the petitioner was

attempting to coach Garcia's responses,  Officer Conway asked the petitioner to speak in English.

(*Id.*)  When the petitioner again attempted to speak to Garcia in Spanish, the men were physically

separated.  (*Id.* at 209.)  At this point the petitioner refused to speak with Officer Conway,

claiming that he did not understand English.  (*Id.* at 210.)  Officer Conway then turned his

attention to Garcia,  and determined that Garcia's responses as to where he and the petitioner had

been and where they were going differed from those given by the petitioner.  (*Id.* at 210-11.)

Officer Conway noted that Garcia was extremely nervous and kept trying to make eye contact

with the petitioner.  (*Id.* at 217.)

At this point Officer Conway peered into the vehicle through the open passenger-side

door and saw what appeared to be a credit card or ID card in the open pocket of the side door

panel.  (*Id.* at 218-19.)  Officer Conway retrieved the card, which was a student photo ID and

which clearly did not belong to Garcia.  (*Id.* at 219.)  The student ID belonged to Joel Rojas, the

person later identified by DiMartino as one of his captors.  (*Id.* at 225, 424-26.)  Keenly aware

that DiMartino was still missing, and given the factual circumstances of the stop, Officer

Conway determined to open the trunk of the Dodge Intrepid to see if DiMartino was inside.  (*Id.* at 226-29.)

When Officer Conway opened the trunk, he saw an N.Y.P.D. baseball cap, a t-shirt with the N.Y.P.D. logo on it, and what appeared to be an off-duty shield holder and chain sticking out from underneath the shirt.  (*Id.* at 229.)  Officer Conway also found a loaded handgun and a set of keys.  (*Id.* at 229-30, 284-85.)  The petitioner and Garcia were then arrested.  (*Id.* at 231.)

After that arrest, Officer Taormina continued down Monarch Avenue to where fellow officers had located a dark 1990 Lincoln sedan suspiciously parked between two houses.  (*Id.* at 286-87.)  Officer Taormina looked into the car and saw a pair of latex gloves on the front seat.  (*Id.* at 288.)  Concerned that DiMartino could be inside this trunk, Officer Taormina attempted to open it without success.  (*Id.* at 288.)  Acting on a hunch, Taormina secured the keys found in the trunk of the Dodge driven by the petitioner.  (*Id.* at 289.)  Those keys opened the trunk of the Lincoln, but the trunk was empty.  (*Id.* at 291.)

Meanwhile, DiMartino, who was being held in the van, was driven to a location, later identified as 943 Willoughby Street in Brooklyn.  (*Id.* at 397; *see id.* at 624-26.)  There, DiMartino was dragged out of the van, up a flight of stairs, and placed on a bed.  (*Id.* at 397.)  DiMartino's bindings were replaced with zip-ties, his mouth was duct taped shut with the sock still inside, and his eyes were duct taped closed.  (*Id.*)  A female voice told DiMartino that an old man was going to stay and watch him, and that should he move, the old man would kill him.  (*Id.* at 398.)  DiMartino then heard numerous footsteps leaving the area, and after a short time, he realized that he was alone. (*Id.*)   Groping along a wall, DiMartino found a rough edge that he used to rip through his bindings and free himself.  (*Id.* at 399.)  After removing the tape and hood

from his face and head, DiMartino cut his other bindings, pulled the bars off the window, and jumped to safety. (*Id.*) DiMartino landed in a pile of garbage and eventually made his way to a nearby nursing home, where he was able to call for help. (*Id.* at 399-401.)

After DiMartino's escape, both the Intrepid and Lincoln were impounded and searched by police. (*Id.* at 534.) The search of the Intrepid yielded two mini police shields, which were found in the glove compartment, and an empty wallet, which was found in the center console. (*Id.* at 536.) During the search of the Lincoln, police found more N.Y.P.D. paraphernalia, including a blue N.Y.P.D. t-shirt and an N.Y.P.D. baseball cap. (*Id.* at 536-37.)

In the afternoon on July 10, 2002, Officer Lehane went to 943 Willoughby Street in Brooklyn, where DiMartino had been held. (*Id.* at 644.) Outside the building, Officer Lehane found a plastic tie on the sidewalk, and in a room on the second floor, Officer Lehane discovered and photographed additional ties, a sweatshirt, a broken bottle, and a rolled-up sock. (*Id.* at 650, 655-56, 661.) Behind the nearby nursing home where DiMartino went for help, Officer Lehane found several cut wire ties, a stained t-shirt, and duct tape. (*Id.* at 663.)

On July 11, 2002, after speaking with Carol Lopez, an acquaintance of the petitioner, Detective Brian McMenmy arrested Edward Baez ("Baez"). (*Id.* at 520.) Baez admitted his complicity and took Detective McMenmy to the van used to transport DiMartino. (*Id.* at 521.) The van, which was registered to Baez, was recovered from Rodney and South First Street in Brooklyn. (*Id.* at 521-23.) Inside the van Detective McMenmy observed what appeared to be blood on an armrest. (*Id.* at 522.) The van was impounded, and a later search revealed two phone bills in petitioner's name—one of which contained a blood stain, as well as DiMartino's Costco card, and Mrs. DiMartino's library card. (*Id.* at 545, 548).

Two police line-ups were conducted as part of the investigation. At one line-up held the same day as the arrests, Malvizzo (DiMartino's father-in-law) identified Richard Garcia as the hispanic male he confronted on the front porch earlier that morning. (*Id.* at 167.) At another lineup on August 13, 2002, DiMartino identified Joel Rojas as one of the two occupants in the Dodge Intrepid, as well as being the person who held a gun to his head during the initial abduction. (*Id.* at 424-26.)

Helen Lee-Wyss, a Suffolk County forensic scientist, performed DNA analyses on the various items recovered. The DNA of DiMartino was found on the Peppino's Pizza shirt, (*id.* at 889-90), and was matched to the blood on the petitioner's phone bill, which was found in the back of the van where DiMartino was held, (*id.* at 896). The sock found in the Willoughby Street building contained DiMartino's saliva. (*Id.* at 892.) DNA from the black sweatshirt showed a major component that was consistent with DiMartino and a minor component that was consistent with Joel Rojas. (*Id.* at 932-33.) The DNA from the N.Y.P.D. tee-shirt found in the Lincoln and the DNA from the N.Y.P.D. baseball cap from the Dodge Intrepid matched Richard Garcia. (*Id.* at 904-05, 925.) The DNA from the N.Y.P.D. tee-shirt found in the Dodge Intrepid and from the N.Y.P.D. cap found in the Lincoln matched the petitioner. (*Id.* at 898-99, 908-09.)

**The Defense Case**

The petitioner testified at trial that sometime after midnight on July 10, 2002, while at his home in Brooklyn, he received a call from his friend Richard Garcia, who said he needed to be picked up on Long Island. (*Id.* at 957-59.) The petitioner immediately agreed to pick him up. The petitioner who was unfamiliar with Long Island contacted another friend to get driving directions. (*Id.* at 961-63.) The petitioner drove to Long Island in his Dodge Intrepid and exited

8

the roadway at exit 62.  (*Id.* at 965-66.)  After getting slightly lost, the petitioner eventually

picked up Garcia somewhere along Route 25.  (*Id.* at 968.)  Garcia got into the passengers side of

the Dodge Intrepid.  (*Id.* at 971.)  According to the petitioner, Garcia was carrying a pair of black

gloves and had a key in his hand.  (*Id.* at 972.)  Garcia then gave the petitioner driving directions,

which led them past a spot where approximately ten police cars with flashing lights were located.

(*Id.* at 974.)  According to the petitioner, he was then asked by Garcia to park on a dark

residential side street and open the trunk, which the petitioner did.  (*Id.* at 975-76.)  Garcia exited

the Dodge Intrepid and walked over to a black sedan parked across the street.  (*Id.* at 977-78.)

According to the petitioner, Garcia opened the black sedan, returned to the petitioner's trunk and

closed it.  (*Id.* at 978-79.)   Because the petitioner was talking on his cell phone, he did not pay

close attention to Garcia's movements, nor did he notice if Garcia had placed anything in his

trunk.  (*Id.* at 979-81.)  The petitioner then drove off but immediately got lost.  (*Id.* at 982-83.)

Before the petitioner could ask Garcia what was going on, he noticed a police car behind him.

(*Id.* at 982.)  Garcia looked back and appeared nervous.  (*Id.* at 985.)  As the police car pulled up

alongside the petitioner's vehicle, the petitioner rolled down the car window to ask for directions.

(*Id.* at 986-88.)  In response, the petitioner testified that the police officer pulled him out of the

car, pointed his gun at him, kicked him in the groin twice and kneed him in the lower abdomen.

(*Id.* at 986-91, 994-97.)

The petitioner testified that he did not know how the gun, police shield, and clothing got

into his trunk or how Rojas's ID got into his car.  (*Id.* at 999-1000, 1009-10.)  The petitioner did

acknowledge owning a baseball cap with a police logo which he kept in the Dodge Intrepid.  (*Id.*

at 966.)  He also owned a t-shirt with a police logo that was stored in the van.  (*Id.* at 1006-07.)

9

According to the petitioner, these items were part of his softball team uniform and the police logo was chosen to commemorate the tragedy of September 11th. (*Id.* at 1007.) Finally, the petitioner explained that his phone bill was in Baez's van because he was hiding it from his wife (*Id.* at 1010-12.) The defense called no other witnesses.

## PROCEDURAL HISTORY

### Indictment and Pretrial Proceedings

The petitioner was charged with Kidnapping in the First Degree, in violation of New York Penal Law § 135.25, Kidnapping in the Second Degree, in violation of New York Penal Law § 135.20, Robbery in the First Degree, in violation of New York Penal Law § 160.15, Criminal Use of a Firearm in the First Degree, in violation of New York Penal Law § 265.09, two counts of Criminal Possession of a Weapon in the Third Degree, in violation of New York Penal Law § 265.02, and Criminal Impersonation in the First Degree, in violation of New York Penal Law § 190.26. (Indictment[4].)

Prior to trial, the petitioner's counsel moved to suppress the evidence seized from the trunk of the Intrepid. (Omnibus Mot.[5] ¶ II; Def. Mot. of 1/22/2003[6] ¶ 1.) A *Huntly* hearing was held on February 25, 2003 and February 27, 2003 where testimony was heard from Officers

---

[4]"Indictment" refers to the Suffolk County Indictment of Richard Garcia, Rafael Mella-Rodriguez, and Edward Baez. It can be found in the state court record.

[5]"Omnibus Mot." refers to Rodriguez's Omnibus Motion dated October 23, 2002. It can be found in the state court record.

[6]"Def. Mot. of 1/22/2003" refers to Rodriguez's Notice of Motion dated January 22, 2003. It can be found in the state court record.

Conway, Taormino, and Garcia.  (*See Huntly* Tr.[7])  On April 1, 2003, the trial court issued an order denying the petitioner's motion to suppress, finding that Officer Conway's stopping of the petitioner's Intrepid was permissible given Conway's testimony that the vehicle was traveling in excess of the posted speed limit, with the headlights off.  (Order of 4/1/2003[8] at 3.)  The court also found that Officer Conway opened the trunk, not to obtain evidence, but to search for the kidnapping victim and that the search of the trunk was lawful under the emergency exception set forth in *People v. Molnar*, 98 NY2d 328 (2002).  (*Id.* at 4.)  On April 24, 2003, the petitioner moved for re-argument on his motion to suppress, arguing that the judge overlooked facts and misinterpreted facts testified to at the hearing.  (*See* Def. Mot. of 4/24/2003[9].)  This motion was denied on May 16, 2003.  (Order of 5/16/2003[10].)

**Trial and Sentencing**

The petitioner's trial began on September 3, 2003.  (Tr. at 1.)  The state called Eli Grinspan, Francesca DiMartino, Domenico Malvizzo, Michael DiMartino, Charles Hopkins, Helen Lee-Wyss, Officers Hom, Conway, Taormina, Garcia, Lehane, and Messina, Detectives Powell, McMenemy, Rivera, Weber, and Degennaro, and Lieutenant Rios.  (*Id.* at 23, 35, 68, 152, 189, 275, 314, 346, 358, 510, 525, 596, 606, 614, 714, 789, 806, 862.)  The defense called

---

[7]"*Huntly* Tr." refers to the transcript of the *Huntly* hearing held on February 25, 2003 and February 27, 2003.

[8]"Order of 4/1/2003" refers to the trial court's order of April 1, 2003.  It can be found in the state court record.

[9]"Def. Mot. of 4/24/2003" refers to Rodriguez's Notice of Motion dated April 24, 2003. It can be found in the state court record.

[10]"Order of 5/16/2003" refers to the trial court's order dated May 16, 2003.  It can be found in the state court record.

the petitioner, Rafael Mella-Rodriguez. (*Id.* at 947.)

On September 12, 2003, the jury rendered its verdict, and the defendant was found guilty on all seven counts. (Tr. at 1291-93.) On September 29, 2003, the petitioner was sentenced. (Mins. Sent.[11] at 1.) The court sentenced the petitioner to an indeterminate term of imprisonment of twenty years to life on count one. (*Id.* at 12.) The court dismissed count 2, kidnapping in the second degree, as a lesser included offense. (*Id.*) The court sentenced the petitioner to a definite term of imprisonment of ten years on counts three and four. (*Id.*) The court sentenced the petitioner to indeterminate terms of imprisonment of two to six years on counts five and six. (*Id.* at 12-13.) The court sentenced the petitioner an indeterminate term of imprisonment of one to three years on count seven. (*Id.* at 13.) Each of these sentences were to run concurrently. (*Id.*)

### Direct Appeal

The petitioner's appellate counsel filed a notice of appeal from his conviction to the New York Supreme Court, Appellate Division, Second Department. In his appeal, the petitioner raised six issues. First, the petitioner argued that he was denied his constitutional right to a trial by jury because of an instruction given by the trial judge that the petitioner argues delegated to the jury the role of determining the elements of the crimes charged in the Indictment. (Appellant Br.[12] at 16.)

Second, the petitioner argued that the trial court erred when it failed to suppress the

---

[11]"Mins. Sent." refers to the Minutes of Sentence. It can be found in the state court record.

[12]"Appellant Br." refers to Rodriguez's Appellant's Brief submitted to the Appellate Division on direct appeal.

evidence recovered as a result of the search of the Intrepid's trunk. (*Id.* at 21.) The petitioner argued that the search was not on consent, probable cause did not exist, and that the emergency doctrine did not apply. (*Id.* at 23-24.) The petitioner also argued that even if the initial opening of the trunk was permitted under the emergency exception, moving the tee-shirt constituted a separate search, which was without probable cause. (*Id.* at 29.)

Third, the petitioner argued that he was denied effective assistance of counsel when trial counsel failed to request a circumstantial evidence charge. (*Id.* at 34.) In this regard, the petitioner claims that all of the evidence against him was circumstantial, and under New York law, the court was required to give a special circumstantial evidence instruction. (*Id.* at 34-35).

Fourth, the petitioner argued that he was denied his right to a fair trial by the prosecutor's comments during summation. (*Id.* at 36.) The petitioner claims that the prosecutor's statements mischaracterized and denigrated his defense. (*Id.*) He also claims that the prosecutor shifted the burden of proof to the defense, acted as an unsworn witness, improperly incited the emotions of the jury, and improperly argued facts that are not found in the record. (*Id.* at 38-42.)

Fifth, the petitioner argued that the people failed to prove his guilt beyond a reasonable doubt. (*Id.* at 43.)

Sixth, the petitioner argued that the sentence imposed upon him was harsh and excessive, and it should be modified in the interests of justice. (*Id.* at 48.)

On April 10, 2007, the Appellate Division affirmed the petitioner's conviction. *People v. Mella-Rodriguez*, 39 A.D.3d 671, 672 (2nd Dep't 2007). As to the petitioner's first and fourth claim, the Appellate Division held that the claims were unpreserved for appellate review, but in any event are without merit. *Id.* As to the petitioner's second claim, the Appellate Division held

that the search of the trunk was valid under the emergency exception doctrine, and as to the petitioner's argument concerning the movement of the shirt, that argument was not preserved. *Id.* As for all of the petitioner's other claims, the Appellate Division held they were without merit. *Id.*

Following the Appellate Division's decision, the petitioner sought leave to appeal his case to the New York Court of Appeals. On June 21, 2007, the New York Court of Appeals denied leave to appeal the Appellate Division's decision. *People v. Mella-Rodriguez*, 9 N.Y.3d 848 (2007).

**The Habeas Petition**

The petitioner filed his Petition for Writ of Habeas Corpus on June 10, 2008. In this petition, the petitioner asserts five claims:

1. The petitioner was denied his constitutional right to a trial by jury by the trial judge's improper supplemental jury charge.

2. The trial court erred when it failed to suppress the evidence recovered from the search of the trunk of the Dodge Intrepid.

3. The petitioner was denied the effective assistance of counsel when counsel failed to request the special circumstantial evidence charge and failed to object to the court's failure to give that charge.

4. The petitioner was denied his right to fair trial by the prosecutor's comments during summation.

5. The prosecution failed to prove the petitioner guilt beyond a reasonable doubt.

**DISCUSSION**

**I.  Statute of Limitiations**

The Antiterrorism and Effective Death Penalty Act of 1996 created a one year statute of

limitations on an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2244(d)(1). This limitation period begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(a). In a case where a direct appeal is taken, the statute of limitations period begins to run once the United States Supreme Court denies *certiorari*, or if *certiorari* is not sought, when the time to seek *certiorari* expires. *Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001). Here, the New York Court of Appeals denied leave to appeal on June 21, 2007, and thus the time for the petitioner to seek *certiorari* expired on September 19, 2007. As the petitioner's petition was filed on June 10, 2008, the claims raised therein are timely.

## II.     Exhaustion

As a prerequisite to federal habeas corpus review, a petitioner must exhaust his or her available state remedies. *See* 28 U.S.C. § 2254(b) and (c); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997); *Daye v. Attorney General of New York*, 696 F.2d 186, 190 (2d Cir. 1982) (en banc). To satisfy this exhaustion doctrine, a habeas corpus petitioner must meet a two-prong test.

First, the petitioner must "fairly present" his or her federal claim to the highest state court from which a decision can be rendered. *Daye*, 696 F.2d at 190-191, n.3. A claim is "fairly presented" if the state courts are informed of "both the factual and the legal premises of the claim [asserted] in federal court." *Id.* at 191. In particular, the same material factual allegations asserted in the federal habeas corpus petition must have been brought before the state court, in order to provide the state court with "a fair opportunity to pass upon [the] federal claim." *Id.*

Additionally, "the petitioner must have placed before the state court essentially the same legal doctrine [asserted] in [the] federal petition." *Id.* at 192. A petitioner must alert a state court "to the fact that the [prisoner is] asserting claims under the United States Constitution" by clearly stating so. *Duncan v. Henry*, 513 U.S. 364, 365-66, *reh'g denied*, 514 U.S. 1032 (1995).

A petitioner, however, need not cite "book and verse" of the federal constitution. *Picard*, 404 U.S. at 278. Rather, the Second Circuit has stated, a petitioner can satisfy this prong by (a) relying on pertinent federal cases employing constitutional analysis; (b) relying on state cases employing constitutional analysis in like fact situations; (c) asserting the claim in terms so particular as to call to mind a specific right protected by the Constitution; or (d) alleging a pattern of facts that is well within the mainstream of constitutional litigation. *See Daye*, 696 F.2d at 194.

Second, "having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure appellate review of the denial of that claim," either by direct appeal or collateral attack. *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981) (citation omitted); *see also Nelson v. Walker*, No. 94-CV-1702, 1996 WL 148321, at *5 (E.D.N.Y. Mar. 20, 1996), *aff'd*, 121 F.3d 828 (2d Cir. 1997). Thus, "even if a claim is not raised at trial or on direct appeal, a claim pursued throughout a full round of state post-conviction proceedings is exhausted." *Garrett v. Garvin*, No. 97-CV-2495, 1998 WL 812589, at *1 (E.D.N.Y. Apr. 20, 1998) (citations omitted).

Here, the petitioner's claims are exhausted. Each claim was raised verbatim in the petitioner's brief to the Appellate Division, (Appellant Br. at 16, 21, 34, 36, 43.), and with the exception of the fourth claim, the petitioner's appellate brief cited to either the United States Constitution or federal case law. (*Id.* at 16, 23, 30-31, 34-35, 43.) As to the petitioner's fourth

claim, that the petitioner was denied his right to a fair trial due to prosecutorial misconduct, by the very nature of the claim, it alleges facts well within the mainstream of constitutional litigation. *Garofolo v. Coomb*, 804 F.2d 201, 205 (2d Cir. 1986) (holding that "the claim of prosecutorial misconduct ha[s] sufficiently familiar federal constitutional implications to be within the mainstream of constitutional litigation"). Lastly, these claims were pursued through all available mechanisms for direct appeal when the petitioner sought leave to appeal the Appellate Division's decision to the New York Court of Appeals.[13] Thus the petitioner's claims are exhausted.

## III. The Procedural Bar

Even if exhausted, where the state court's denial of the petitioner's claim rests on an independent and adequate state-law ground, such as a procedural default, the court is ordinarily barred from considering that claim on federal habeas corpus review. *See Murden v. Artuz*, 497 F.3d 178, 191 (2d Cir. 2007). Here, the Appellate Division denied part of the petitioner's second claim, specifically his claim that Officer Conway did not have probable cause to move the N.Y.P.D. shirt, because that claim was unpreserved for appellate review. *Mella-Rodriguez*, 39 A.D.3d at 672. Additionally, the Appellate Division held that the petitioner's first and fourth claims, that he was denied his right to a trial by jury because of the trial judge's supplemental jury charge and that he was denied his right to a fair trial because of the prosecutor's remarks

---

[13]While the parties have not provided the court with a copy of the petitioner's letter seeking leave to appeal, given that the petitioner's habeas claims are identical to those in his appellate brief and given that the respondent does not argue that the petitioner's claims are unexhausted, the court will assume that each of the claims in the petitioner's Appellate Brief were raised in the letter seeking leave to appeal filed with the New York Court of Appeals.

during summation, were also unpreserved for appellate review[14]. *Id.*

For these procedural defaults to be deemed an adequate state-law ground for denying the petitioner's claim, they must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." See *Murden*, 497 F.3d at 192 (quoting *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006)). In analyzing this issue of adequacy, the court is to consider three "guideposts," which were defined in the context of a procedural default occurring at trial:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee v. Kemna*, 534 U.S. 362, 381-85 (2002)).

The procedural bar relied on in this case stems from New York statutory law, which sets forth two ways that a question of law is preserved for appeal: through an objection at trial by the party later claiming the error, or when the trial court makes an express ruling with regard to the particular question. N.Y.Crim.Proc.Law § 470.05(2); *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). To preserve, the defendant must make his or her position known to the court. A general objection is not sufficient; the defendant must specifically focus on the alleged error.

---

[14]The Appellate Division's specific holding was, "[Defendant's contentions] are unpreserved for appellate review. In any event, those claims . . . are without merit." Where the appellate court ruled that a claim is not preserved for appellate review, but then rules 'in any event' on the merits, such a claim is considered procedurally defaulted. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005).

*Garvey*, 485 F.3d at 714.

When the three guideposts are considered, the procedural grounds relied on by the Appellate Division are adequate. The petitioner did not argue that the movement of the N.Y.P.D. shirt constituted an illegal search in his motion to suppress, during the *Huntly* hearing, or in his motion seeking a re-argument. Nor did the petitioner object to the judge's supplemental jury charge or to the prosecutor's remarks during summation. Had he objected in any of these instances, the trial court would have had an opportunity to consider those objections. Thus, compliance with the procedural rule would have had an impact on the trial court's decision. *See id.* at 719 (holding that specific compliance with § 470.05(2) would have had an impact on the trial court's decision were defendant failed to raise a specific argument in seeking to suppress an out of court identification of the defendant). Second, New York appellate courts consistently require defendants to comply with § 470.05(2) and properly preserve questions of law. *See Id.* at 718 (stating that "§ 470.05(2) is a firmly established and regularly followed New York procedural rule"). Third, the petitioner's failure to preserve these issues for appeal was not a mere technical violation of § 470.05(2); he in no way gave notice of his arguments to the trial court, defeating the purpose of the rule.

Under habeas review, however, even when a claim is denied based on an independent and adequate state-law ground, a claim can nonetheless be reviewed on the merits if the petitioner establishes either (1) cause for failing to properly raise the claim in state court and actual prejudice from the alleged violation of federal law, or (2) that the failure to address the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 502 U.S. 722, 750 (1991). To show cause, a petitioner must show "some objective factor external to the defense"

prevented his efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show prejudice, the petition must show that the alleged violation of federal law worked to his "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982). To establish a fundamental miscarriage of justice, a petitioner would have to show that the alleged violation of federal law has "probably resulted in the conviction of one who is actually innocent." *See Murray*, 477 U.S. at 496.

Here, the petitioner has not made any argument as to the cause of his failure to raise any of these objections at trial. Further, the petitioner has not established actual innocence so as to overcome the procedural bar for his claim. Therefore the petitioner's first claim, fourth claim, and second claim, limited to the movement of the tee-shirt, are unreviewable on the merits.

## III.     Review on the Merits

Under the AEDPA, where a federal constitutional claim has been adjudicated on the merits by the state court, this court must accord great deference to that prior decision. *See* 28 U.S.C. § 2254(d). A habeas petition shall not be granted with respect to any claim that was adjudicated on the merits in State court proceeding unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). Further, "a determination of a factual issue made by a State court shall be presumed correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is contrary to clearly established federal law when the state court

applies a rule that "contradicts the governing law" set forth in Supreme Court decisions, or when the state court is faced with a set of facts that is materially indistinguishable from a prior Supreme Court decision, the state court reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is based on an unreasonable application of federal law when the state correctly identifies the governing legal principle, but unreasonably applies the principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). To be contrary to, or an unreasonable application of federal law, a state court decision must be more than just incorrect or erroneous; it must have been objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

### 1. Constitutional right to a trial by jury

In his first claim, the petitioner argues that he was denied his constitutional right to a trial by jury. This claim arises from the trial court's answering of a question asked by the jury during deliberations. During the first day of deliberations, the jury asked the court, by written note, for a printed copy, not a readback, of the elements of each indictment. (Tr. at 1242.) In response to the question, the court said,

> So, what I'm going to do to respond to this is, simply, read the elements. I'm not going to give the definitions. I'll go down one by one, so it will be a lot more condensed. And maybe a juror can pick two of them and another juror can focus on the third count or if you want to split up the memorization.

(Tr. at 1246.) The petitioner argues that through this statement, the trial judge is delegating to the jury his duty to determine what the law is. The petitioner claims that the proper instruction would have been that if the jury did not grasp of the elements, additional readbacks would be

available without limit. Although this claim is not reviewable as it is barred by an independent and adequate state law ground, the claim is nonetheless without merit.

It has been long held that a jury trial "is a trial by jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence." *Freeman v. U.S.*, 227 F. 732, 744 (2d Cir. 1915) (quoting *In Capital Traction Co. v. Hof*, 174 U.S. 1, 13 (1889)). When determining whether an improper judicial delegation occurred, courts have focused on whether the action delegated involved a "judicial function" or the "ultimate decisionmaking authority." *Christian v. Artus*, 04-CV-10174, 2006 WL 2463432, at *9 (S.D.N.Y. Aug. 23, 2006). Here the trial judge did not delegate the authority to determine what the law is. The trial judge merely gave a suggestion to the jury as to how they might better remember the instructions that the judge was about to provide. The petitioner's leap, that the above statement invited the jury to define the relevant law, despite the fact that the judge subsequently provided the jury with the elements of each count, is simply not supported by the facts.

## 2.    Suppression of Evidence

In his second claim, the petitioner argues that the evidence seized as a result of the search of the trunk of the Intrepid should have been suppressed. The petitioner argues that Officer Conway did not have probable cause to search the trunk, and the emergency doctrine did not apply. The petitioner also argues that even if the emergency doctrine did apply, the doctrine only permits a search of where the victim of the kidnapping could be hidden. Once the trunk was open and it was immediately apparent that DiMartino was not inside, the petitioner argues, the

22

search must stop. Officer Conway's subsequent moving of the N.Y.P.D. shirt and hat thus constituted an illegal search as no probable cause existed for a general search the car.

The petitioner's second claim must fail. It is been long established that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). *Grey v. Hoke*, 933 F.2d 117, 121 (2d. Cir. 1991). A denial of the full and fair litigation of a defendant's constitutional claims occurs in two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process. *See Capellan v. Riley*, 975 F.2d 67, 70 (2d. Cir. 1992).

Federal courts, however, "have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim.Proc.Law § 710.10 *et seq*. . . .as being facially adequate." *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F.Supp. 195, 201 (E.D.N.Y.1989) and citing *Shaw v. Scully*, 654 F.Supp. 859, 864 (S.D.N.Y.1987)). Therefore, the petitioner would only be able to pursue his Forth Amendment claim if he could establish that there was an unconscionable breakdown in the underlying process. The petitioner cannot make such a showing.

The petitioner's attorney made a motion to suppress the contents of the trunk. A hearing was held where the petitioner was able to cross examine Officer Conway and the other officers at the scene, as well as present his own evidence challenging the search. The petitioner's attorney

was given an opportunity to submit a post hearing memorandum of law and specify in detail the bases for suppressing the evidence found as a result of the search. Further, after obtaining an adverse ruling, the petitioner's attorney filed a motion seeking re-argument.

It cannot be disputed that the petitioner was given an opportunity to fully and fairly litigate his Fourth Amendment claim. As a result, even if the state court erroneously decided this issue, the claim is not cognizable on habeas review. *See Capellan v. Riley*, 975 F.2d 67, 71 (2d. Cir. 1992). The petitioner cannot gain federal review of a fourth amendment claim simply because a federal court may have reached a different result.

### 3. Ineffective Assistance of Trial Counsel

In his third claim, the petitioner argues that he was denied effect assistance of trial counsel because, although all of the evidence presented at trial was circumstantial, his attorney did not request a circumstantial evidence charge. This claim, however, is without merit.

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial as guaranteed by the Due Process Clause. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Id.* at 685 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275-76 (1942)). Because the Sixth Amendment envisions counsel playing a critical role in an adversarial system that produces just results, an accused is entitled to be assisted by an attorney, whether retained or appointed, who plays that necessary role to ensure that the trial is fair. *Strickland*, 466 U.S. at 685. Thus, "'the right to counsel is the right to the effective assistance of counsel.'" *Id.* at 686 (quoting

24

*McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)).

Where the accused is represented by counsel, counsel's assistance will be found ineffective when counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686. The petitioner meets this standard only by satisfying the two-prong test set forth in *Strickland*. First, the petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. Judicial scrutiny of counsel's performance, however, must be highly deferential, and the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 89. The petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Id.* Second, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In *People v. Sanchez*, the New York Court of Appeals held that where the evidence against a defendant is entirely circumstantial, "the jury should be instructed in substance that it must appear that the inference of guilt is the only one that can fairly and reasonable be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence." 61 N.Y.2d 1022, 1023 (1984). During the petitioner's trial, the court instructed the jury, "[i]f two inferences may be drawn from the same evidence and one is consistent with guilt and one is consistent with lack of guilt, the defendant is entitled to the inference consistent with lack of guilt." (Tr. at 1193.) This instruction plainly conveys to the jury the substance of the *Sanchez* rule, that guilt cannot be established where an inference could

be drawn from evidence that supports a lack of guilt.

Further, the petitioner has not made any argument as to how a different circumstantial charge, when placed in the context of the DNA evidence, the handgun, the bloody cell phone bill, the keys to the Lincoln, Rojas's ID, and the line up identifications of Garcia and Rojas, would have resulted in a favorable verdict. Even if trial counsel's conduct fell below an objective standard of reasonableness, there has been no showing that there is a reasonable probably that the results of the trial would have been different.

### 4. Prosecutorial Misconduct

The petitioner argues that the prosecutor, in her summation, committed four acts of prosecutorial misconduct. Although this claim is not reviewable as it is barred by an independent and adequate state law ground, it is nonetheless without merit.

While prosecutorial misconduct can result in the reversal of a conviction, inappropriate comments alone would not justify a reversal in an otherwise fair proceeding. *See United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). To warrant reversal, the misconduct must cause the defendant "substantial prejudice" by "'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *Elias*, 285 F.3d at 190 (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999). The prosecutor's remarks during summation only amount to a denial of due process if they constitute "egregious misconduct," which is assessed by considering a three step test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. *Id.*

As for his first argument, the petitioner claims the prosecutor mischaracteried and denigrated the defense. Specifically he points to the prosecutor's statement that,

26

Mr. Herzweig has laid out for you three choices, basically, three different scenarios, choices for you in your deliberations, alternative theories, three of them.

One, his client is completely innocent, completely innocent of everything.

But if you don't believe that, if you find him a little bit hard to believe, then don't believe that there was a kidnapping; all right?

So, if you don't believe he's innocent of anything, then this wasn't a kidnapping, so he can't be guilty of something that didn't really occur.

So if you don't believe him because he's completely innocent, which is your first option, go to plan B.

Well, if you don't think he's telling the truth, then you know what? This wasn't really a kidnapping, didn't happen.

Because, after all, they want you to think Mike DiMartino is just a dirtbag and that you shouldn't care about what happened to him on July 10th. You shouldn't care about how his family was terrorized on July 10th. Because he's a dirtbag. That's what they want you to believe. That, despite the evidence, you should just wash it all away and acquit because he's not worthy of this.

And, alternative number three is, even if you don't believe my client, and you do believe it's a kidnapping, acquit him anyway because the police hurt his penis; all right? So that's your third option. All three scenarios.

(Tr. at 1144-46.) The petitioner claims that he never argued that the jury should acquit based upon DiMartino's bad character or because the police's physical abuse. The petitioner argues that those issues were discussed in order to impeach those witnesses, not to establish a theory of innocence. The petitioner's argument is without merit.

While the respondent admits that the prosecutor's phrasing of the three choices might have been "infelicitous," (Resp. at 18), that alone is not enough to overturn the conviction. A review of defense counsel's summation shows that counsel argued that the petitioner "had nothing to do with [the kidnapping]." (Tr. at 1097, 1110.) Counsel also argued, "This may not have been a kidnapping. This may have been a situation, a business meeting." (*Id.* at 1107.) Finally, counsel recapped the petitioner's testimony that a police officer had kicked and kneed him, and counsel attributed the other police officers' denial of having witnessed the beating to

the "blue wall of silence." (*Id.* at 1135.) When defense counsel's summation is considered, it is clear that the prosecutor's statements were not inappropriate, and thus do not constitute egregious misconduct. *See U.S. v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) (holding that "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation").

Second, the petitioner argues that the prosecutor improperly shifted the burden of proof to the defendant when the prosecutor stated,

> Delwin calls him back. He gets the instructions on a piece of paper which, ladies and gentlemen, he never produces. This is the first I'm hearing of this, this piece of paper.
> Wouldn't you make sure that your lawyer got that piece of paper and brought it to someone's attention, this corroborates my client's story?
> Where is it? Where is it? Piece of paper.

(*Id.* at 1162.) The petitioner also cites to where the prosecutor questions why the petitioner has not told anyone about Delwin or given the police Delwin's phone number, and the prosecutor questions why the petitioner didn't call his wife or brother-in-law as a witnesses when he claimed that they could vouch for his story. (*Id.* at 1170-71.) In making these arguments, the petitioner argues that he is being required to provide exculpatory evidence. Also, the petitioner argues that in stating that it is the first the prosecutor is hearing of piece of paper, the petitioner claims that she is acting as an unsworn witness.

This argument fails as it is well established that "the government may comment on a defendant's failure to call witness to support his factual theories." *United States v. Bautista*, 23 F.3d 726, 733 (2d. Cir. 1994). When the challenged statements are considered in context, a reasonable jury would not have understood them as anything other than an argument that the jury need not believe the petitioner's uncorroborated theories. Further, any ambiguity that may have

been caused by the prosecutor's statements with respect to the burden of proof would have been clarified by the district court's instruction that it is the government that bears the burden of proof as to every element. *See Id.* (holding that the any ambiguity as to burden of proof caused by the prosecutor's statements was undoubtedly clarified by the district court's instruction).

Third, the petitioner argues that the prosecutor appealed to the jury's sympathy by invoking the passions surrounding the terrorist attacks of September 11, 2001.

> And he tells you, ladies and gentlemen, yesterday that he wore this T-shirt for his baseball team, all the members, while their real shirts were getting numbers on them. They decided to commemorate—are his words exactly—nine one in these T-shirts, and he told you that. Do you remember that? Like he's some kind of a hero.
> Well, I submit to you, ladies and gentlemen, that yesterday he spit on the memory of those who were lost on September 11th. The very people who were honored today, September 11th, he spit on that memory. I submit to you that is so offensive.
> He's telling you that that was to commemorate September 11th? Well, I submit to you that this defendant commemorated September 11th in a very different way. He celebrated it, he remembered it, he commemorated it on July 10th, 2002 when he and his friends put on those shirts, put on those hats, he commemorated it when they brought to Suffolk County a gun loaded with hollow point bullets. That's how he commemorated September 11th. He commemorated September 11th by planning a kidnapping, a kidnapping of Michael DiMartino. And I submit to you he showed his reference for September 11th, bearing this T-shirt, while Mike DiMartino was being beaten in that van.

(Tr. at 1173.)

It is well established that "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation," *see Rivera*, 971 F.2d at 884, and while the prosecutor cannot make an argument that is simply designed to inflame the passions of the jury, *see Elias*, 285 F.3d at 190, that is not what happened in the petitioner's case.

A proper analysis of the prosecutor's statement must consider the testimony given at trial.

On September 10, 2003, in support of his claim that the N.Y.P.D. shirts and hats were part of a

baseball uniform, the petitioner testified:

> Q    Now, as of July 10th, 2002, does the — did the team have any kind of
>      uniform?
> A    No, we only had the pants.
> Q    Did you have any shirts?
> A    We had to buy the shirt and the hat, and we did it in commemoration for
>      nine one one.
> Q    What shirts did you buy?
> A    The T-shirts of N.Y.P.D.

(Tr. at 1007.)  In his testimony, the petitioner is thus the first to make reference to the terrorist

attacks of September 11th, in a clear attempt to garner the sympathy of the jury.  The prosecutor's

comments were in response to the petitioner's appeal to the emotions surrounding September

11th.  When a defendant opens the door, such a counter is permissible.  *U.S. v. Young*, 470 U.S. 1,

12-13 (1985) (holding "the import of the evaluation has been that if the prosecutor's remarks

were 'invited,' and did no more than respond substantially in order to 'right the scale,' such

comments would not warrant reversing a conviction).

Nonetheless, even if the prosecutor's statements were improper, the petitioner's challenge

would still fail when the third factor is considered.  Absent the prosecutor's remark, the certainty

of the conviction is unchanged.  A reasonable jury could readily infer the petitioner's guilt from

the evidence.

Fourth, the petitioner argues that the prosecutor committed misconduct when she urged the

jury to consider facts from outside the courtroom.

> When was the last time you saw a patrol officer wearing a hat?  They don't
> wear them.  They don't wear them.
> Just later on, after this trial is over, just take an informal survey of any cops

you see riding around, other than parade detail perhaps or sobriety check points for D.W.I.'s where there's an organized effort. They don't wear hats.

(*Id.* at 1169-70.)

Here, the prosecutor asked the jury to draw upon their own experiences and observations of patrol officers. The prosecutor later sought to clarify her position, affirming that she is not attempting to state a fact, when she said, "I submit to you—and I'm not suggesting to you that that's out of the realm of possibility that that could ever happen. Sure, it could happen. But it didn't happen here." (*Id.* at 1170.) To the extent the prosecutor asked the jurors to look around "after this trial is over" that ambiguous comment, to the extent it was improper, was mitigated by the court's jury instructions. At the start of trial, the court made clear in its jury instructions that the case could only be decided based on what was testified to and admitted into evidence "in this courtroom." (*Id.* at 9.) Moreover, after summations the court reiterated this instruction by instructing the jury:

> The evidence you must consider, which I charge you to consider, is the testimony of the witnesses plus any exhibits which are permitted to be marked into evidence.

(*Id.* at 1192.)

> From the evidence, you must decide what the facts are. The finders of fact, that's your function and yours alone. . .
> Remember that in determining what the facts are, I charge you not to wonder about things which are not in evidence. Make your decision based solely on the evidence.
> Please, understand, what the lawyers say is not evidence. . . it is your recollection which controls. Not the attorneys. If you are unsure of your own recollections during deliberations, the Court Reporter . . . may be called upon to reread portions of the testimony.

(*Id.* at 1188-90.) These instructions make it clear to the jury that the prosecutor's statements were not evidence and that they were not to consider anything they might learn or see on the

outside.

Finally, the petitioner's challenge would also fail when the third factor is considered. As before, absent the prosecutor's remark, the petitioner's conviction would still be certain. A reasonable jury could readily infer the petitioner's guilt from the evidence at trial.

### 5. Sufficiency of the Evidence

The petitioner argues that evidence in the case is circumstantial and is insufficient to support a verdict of guilty beyond a reasonable doubt. Specifically, the petitioner argues that the DNA evidence found on the tee-shirts and baseball caps is consistent with his testimony that the shirts and hats were used as baseball jerseys. The petitioner also argues that the telephone bills found in the Mercury van were dated March 24, 2002, predating the kidnapping by many months, and making their probative value minimal.

"The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)(quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Due process, however, requires more than a trial with proper jury instruction. The fact finder must rationally apply that standard to the facts in evidence. *Id.* at 317. Reasonable doubt, however, is not a precise concept; thus, sufficiency review of a jury verdict is both general and deferential. *Policano v. Herbert*, 453 F.3d 79, 92 (2d Cir. 2006). When a claim is made that the evidence is insufficient to support a conviction, the court must review the record and determine whether the record evidence, viewed in the light most favorable to the prosecution, could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318; *Policano*, 453 F.3d at 92.

32

While the petitioner may have provided an alternate theory which explains the DNA evidence found on the shirts and hats, his theory, applied to a mere fraction of the total evidence, is insufficient to warrant the overturning of the jury verdict.  In a case such as this,  the evidence as a whole must be considered.  When the petitioner's proximity to the kidnapping, the DNA evidence, the handgun, the N.Y.P.D. shirts and hats, the police badges, Rojas's ID, the police line-up identifications and all of the other evidence is considered, there is ample support for the jury's verdict of guilty beyond a reasonable doubt.

### RECOMMENDATION

For all of the foregoing reasons, I recommend that the petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253 (c)(1)(A) because the petitioner has not "made substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Any objections to this report and recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days of service.  Failure to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).


Dated: Central Islip, New York
      July 12, 2010

**SO ORDERED:**


_____/s/_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge